IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WILLIAM R. SEEMAN,

               **Plaintiff,**

      **v.**

PJMP, LLC and RENDEL'S INC.,

               **Defendants.**

Case No. 16 C 8817

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Plaintiff William R. Seeman sued Defendants PJMP, LLC ("PJMP") and Rendel's Inc. ("Rendel's") for disability discrimination, alleging that they violated the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, by firing him because of his depression. Both Defendants have moved for summary judgment, arguing that they are not "employers" within the meaning of 42 U.S.C. § 12111(5) and thus cannot be held liable. For the reasons to follow, the Court grants Defendant PJMP's Motion for Summary Judgment [ECF No. 46] but denies Defendant Rendel's Motion for Summary Judgment [ECF No. 42].

## I. BACKGROUND

The following facts are undisputed except as otherwise noted. (Although Defendants have filed separate statements of undisputed fact, they are identical except for one additional

paragraph in PJMP's. For convenience, the Court will cite to this more inclusive set of materials and attribute it to both Defendants.)

Rendel's is a vehicle dealership that also provides repair and body shop services out of two locations: 119 Republic Avenue and 40 Mills Road, both in Joliet, Illinois. (ECF No. 48 ("Defs.' SUF") ¶ 4; *accord,* ECF No. 58 ("Pl.'s Resp.") ¶ 4.) Rendel's filed its articles of incorporation with the Illinois Secretary of State on May 28, 1965. (*Id.* ¶ 9.) For many years, Rendel's included a towing operation, but it was informed in 2012 that it could no longer secure workers' compensation insurance while still operating a towing and recovery business. (*Id.* ¶ 5.) Rendel's solution was to form a separate limited liability company, PJMP, to house its towing and recovery operation. (*Id.* ¶ 6; *see also*, ECF Nos. 84, 85 ("Defs.' Resp.") ¶¶ 1-2.) In May 2012, PJMP filed Articles of Organization with the Illinois Secretary of State and executed an operating agreement. (Defs.' SUF ¶ 7; *accord*, Pl.'s Resp. ¶ 7.)

PJMP conducts its business out of Rendel's 40 Mills Road location, and it pays monthly rent to Rendel's to the tune of $5,000. (Defs.' SUF ¶¶ 3, 11; *accord,* Pl.'s Resp. ¶ 3; *cf., id.* ¶ 11.) PJMP has a separate office on the premises with a separate cashier. (*See,* Defs.' SUF at Ex. D ("Mazor Tr.") at

30:18-34:9.)    Both companies have separate bank accounts.
(Defs.' SUF ¶ 10; *accord*, Pl.'s Resp. ¶ 10.)    All the vehicles
PJMP uses for towing and recovery services are Rendel's trucks,
and it leases these vehicles from Rendel's for $40,000 a month.
(*Id.* ¶¶ 13-14.)    PJMP "internally allocate[s]" certain of its
expenses to Rendel's but it is unclear whether money is
accordingly transferred between accounts.    (Pl.'s Resp. ¶ 12.)
There is a collective bargaining agreement in place between
Rendel's and Teamsters Local Union No. 179, and it includes
classifications of workers such as tow truck drivers. (ECF
No. 56 ("Pl.'s SAUF") ¶ 36; Defs.' Resp. ¶ 36.)

PJMP does business under the assumed name "Rendel's
Towing." (Pl.'s Resp. at Ex. 10; Defs.' Resp. ¶¶ 25-31.)    The
two entities are presented as one to the public on the Rendel's
website, on the trucks PJMP operates, and on the uniforms its
tow truck drivers wear – all of which include only the Rendel's
name and logo.    (*See,* Pl.'s SAUF ¶¶ 23-27, 40; *accord,* Defs.'
Resp. ¶¶ 23-27, 40.)    Rendel's has one phone number for all
services, including towing and recovery; PJMP does not have a
separate phone book listing; and customers seeking either repair
or towing services call the Rendel's number, are thanked for
calling "Rendel's," and are transferred to the PJMP tow
dispatcher if they need towing or recovery services. (*Id.* ¶¶ 28-

29.) PJMP uses "Rendel's"-inscribed letterhead and, although PJMP issues invoices bearing the PJMP name to customers who receive only towing or recovery services, customers who also receive repair services are generally invoiced on one form bearing the Rendel's name (unless the customer requests separate invoices). (*Id.* ¶ 31.) Such customers usually pay with one check or one credit card payment; the funds get deposited into a Rendel's account and "a ticket for the tow amount is posted to PJMP's account so that an adjustment can be made on the books at the end of the year." (*Id.* ¶ 32.) PJMP tow truck drivers do not have a separate health insurance plan but instead are members of Rendel's group plan, and they also fill out vacation requisition forms bearing Rendel's logo. (*Id.* ¶¶ 37-38.)

Members of the Polcyn family own and operate Rendel's and PJMP. Patrick J. Polcyn ("PJ") owns and is President of both entities. (Defs.' SUF ¶¶ 17-18; *accord,* Pl.'s Resp. ¶¶ 17-18.) PJ was not paid a salary or wages by PJMP during the relevant timeframe but did earn commissions and bonuses from PJMP. (*See,* Pl.'s SAUF ¶ 12; *accord,* Defs.' Resp. ¶ 12.) Patrick R. Polcyn ("PR") was Rendel's body shop manager in 2015 and 2016 but at that time "began getting involved in the towing operation." (*Id.* ¶ 11.) From January 1 through August 21, 2015, PJMP paid PR hourly wages approximately every fourth pay period on a

"straight time" basis; from August 21, 2015 through the end of 2016, PJMP paid PR overtime hourly wages approximately three out of four pay periods. (*Id.* ¶¶ 13-14.)  During 2015 and 2016, Michael Polcyn ("Michael") served as the general manager for each of PJMP, Rendel's, and H&J Truck Leasing, Inc., all of which operated out of the 40 Mills Road location.  (*Id.* ¶ 10.) PJMP paid Michael minimal hourly wages on a "straight time" basis during approximately the first half of 2015; however, PJMP paid Michael significantly more hourly compensation on an "overtime" basis approximately every other pay period from June 6, 2015 through the end of 2016. (*Id.* ¶¶ 15-16.)  The hourly compensation PJMP paid PR and Michael related to their work incident to after-hours towing and recovery jobs. (*Compare,* Pl.'s SAUF ¶ 21; *with,* Defs.' Resp. ¶ 21.)  Rendel's paid all the Polcyns' weekly salaries throughout 2015 and 2016. (Pl.'s SAUF ¶¶ 17-19; *accord,* Defs.' Resp. ¶¶ 17-19.)  To the extent they performed work for PJMP (or, in Michael's case, for H&J Trucking), their salaries were proportionally allocated to the pertinent business in end-of-year accounting adjustments. (*Id.* ¶ 22.)  However, their W-2 forms did not reflect this adjustment, and it is unclear whether money was transferred on a routine or consistent basis between Rendel's and PJMP's bank accounts. (*See,* Pl.'s SAUF at Ex. 2; Defs.' Resp. ¶ 22.)

Another player in the drama is Tammy Mazor ("Mazor"), who is currently the office manager of Rendel's and PJMP. She is in charge of payroll, accounts receivable, and accounts payable for both companies. (Pl's SAUF ¶ 6; Defs.' Resp. ¶ 6.) In 2015, she was the "tow manager," performed scheduling and dispatching for PJMP tow truck drivers, and had supervisory control over PJMP employees. (*Ibid.*) Mazor's salary was paid by Rendel's but, as with the Polcyns', was allocated between Rendel's and PJMP in proportion to the time she spent performing work for each. (*Id.* ¶ 7.)

In January 2014, the Polcyns hired Plaintiff William R. Seeman ("Seeman") as a tow truck operator. (*See,* Defs.' SUF ¶ 20; Pl.'s Resp. ¶ 20.) The Polcyns and Mazor supervised Seeman, providing him with day-to-day towing assignments. (*Id.* ¶¶ 21–22.) Each of Seeman's paychecks was issued by PJMP. (*Id.* ¶ 24.) All Seeman's duties involved towing and recovery, with the exception that about once every other week he was asked to pick up auto parts from various stores for Rendel's repair services and parts department. (Pl.'s SAUF ¶ 33; Defs.' Resp. ¶ 33.) On these occasions, Seeman claims that he was often provided with a PJMP check to pay for the parts; Mazor disputes this, submitting documentary evidence showing checks that PJMP issued to parts suppliers and averring that these were strictly

for PJMP necessities. (*Compare,* Pl.'s SAUF ¶ 34; *with,* Defs.'
Resp. ¶ 34.) Occasionally, Seeman would have out-of-pocket
expenses, such as fuel costs; while he avers that reimbursement
often took the form of a Rendel's check, Mazor swears that he
was reimbursed with petty cash allocated to PJMP. (*Id.* ¶ 35.)

Michael disciplined Seeman on April 28, 2015 and June 16,
2015. (Defs.' SUF ¶ 27; *accord,* Pl.'s Resp. ¶ 27.) In 2016,
Seeman's employment ended after he took some time off work for a
few days and was then rushed to the hospital following an
incident at work. (*See,* ECF No. 37 ("PJMP's Ans.") ¶¶ 16-18.)
The parties dispute whether he resigned or was fired. (*Compare,*
Defs.' SUF ¶ 28; *with*, Pl.'s Resp. ¶ 28.) On Rendel's
letterhead, the "Rendel's Management" acknowledged Seeman's
"resignation on January 14th, 2016." (Pl.'s Resp. at Ex. 9.)

## II. <u>DISCUSSION</u>

Title VII prohibits unlawful employment practices,
including discrimination "against a qualified individual on the
basis of disability in regard to job application procedures, the
hiring, advancement, or discharge of employees, employee
compensation, job training, and other terms, conditions, and
privileges of employment." 42 U.S.C. § 12112(a). Some
employers, however, are exempt from Title VII liability.
Title VII defines an "employer" as a "person engaged in an

industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or proceeding calendar year." 42 U.S.C. § 2000e(b).

The posture of the case does not implicate the merits of Seeman's ADA claim. There is no dispute that, whereas Rendel's had approximately 40 employees in 2015, the most individuals PJMP ever employed during the relevant timeframe for any two-week period was "five or six." (*See, e.g.,* Defs.' SUF ¶ 15; *accord*, Pl.'s Resp. ¶ 15; Defs.' Resp. ¶¶ 8-9.) The sole issues *sub judice* are therefore, first, whether grounds exist to aggregate Rendel's employees with PJMP's such that Title VII liability can attach to PJMP and, second, whether Rendel's had an employment relationship with Seeman such that it is a proper defendant in this case.

Under Rule 56(c), summary judgment may be granted only if there are no genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). An issue is considered "genuine" if a reasonable trier of fact could find in favor of the non-moving party, and "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson v. Liberty Lobby*, *Inc.,* 477 U.S. 242, 248, 252 (1986). To determine whether a genuine issue of material fact exists, the Court views the facts in a light

favorable to Seeman, the non-moving party in this case, drawing all inferences in his favor.  *Celotex,* 477 U.S. at 322.

### A.  Should Rendel's Employees Be Aggregated with PJMP's?

Seeman first argues that PJMP should be deemed within Title VII's orbit because it was one of "an affiliated group of corporations that has in the aggregate the minimum number of employees."  *Papa v. Katy Indus., Inc.,* 166 F.3d 937, 939 (7th Cir. 1999).  In *Papa,* the Seventh Circuit held that affiliated employers could be regarded as a single employer under Title VII in three situations:  (1) where traditional concerns motivating veil piercing are present; (2) where an enterprise splits itself up into a number of corporations, each with fewer than the statutory minimum number of employees, for the express purpose of avoiding liability under antidiscrimination laws; and (3) where a parent corporation directed the discriminatory act or policy of which the employee of its subsidiary is complaining. *See, id.* at 941-42.  In each of these three scenarios, the key inquiry is whether the affiliate was the real decision maker. *Id.* at 941.

Seeman only argues for application of the first scenario – veil piercing.  Indeed, the second and third seem not to apply. It is undisputed that PJMP was formed not to evade Title VII responsibilities (but to enable continued provision of workers'

compensation insurance). And even if, as Seeman seems to allege, the persons responsible for his alleged termination owned Rendel's or served as Rendel's employees, aggregation under the third *Papa* prong is inappropriate absent evidence that they were acting outside their PJMP roles in (allegedly) firing him. *See, Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 365-66 (7th Cir. 2016) ("There are no facts from which it may reasonably be inferred that, when Straeter told Stephenson to fire Bridge, Straeter was wearing anything but a Logansport hat.").

In the words of the Seventh Circuit, affiliated entities may be considered together as a single employer under Title VII "where, the traditional conditions being present for 'piercing the veil' to allow a creditor . . . to sue a parent or other affiliate, the parent or affiliates of the plaintiff's employer would be liable for the employer's debts." *Papa,* 166 F.3d at 941-42. Those concerns manifest when there is "'such unity of interest and ownership that the separate personalities . . . no longer exist'" and "'adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.'" *Worth v. Tyer,* 276 F.3d 249, 259-60 (7th Cir. 2001) (quoting *Van Dorn Co. v. Future Chem. & Oil Corp.,* 753 F.2d 565, 569-70 (7th Cir. 1985)).

### 1.  *Unity of Interest*

As a matter of Illinois law, corporations share a sufficient unity of interest if they (1) fail to maintain adequate corporate records or to comply with corporate formalities, (2) commingle funds or assets, (3) undercapitalize, or (4) treat the assets of another as their own. *Smith v. Fusion Medical Spa, S.C./Synergy Inst.,* 836 F.Supp.2d 773, 776-77 (N.D. Ill. 2011) (citing *Macrito v. Events Exposition Servs. Inc.,* No. 09 C 7371, 2011 WL 5101712, at *4 (N.D. Ill. Oct. 21, 2011)) (citation omitted).

The facts, even when interpreted in the light most favorable to Seeman, do not rise to the level of a unity of interest.  First, there is no question that Rendel's and PJMP were separately incorporated and/or organized, and Seeman does not contend that either entity failed to keep adequate records or otherwise comply with corporate formalities.  Indeed, PJMP formally indicated to the Illinois Secretary of State that it operates under the assumed name "Rendel's Towing."  (Seeman ostensibly faults Defendants for not producing a rental agreement during discovery, but it is hornbook law that month-to-month rental arrangements need not be in writing to be valid. *See, e.g., Kachigian v. Minn,* 320 N.E.2d 173, 175 (Ill. App. 1974) ("Pursuant to the oral agreement between the litigants,

Kachigian, the tenant, paid rent on a monthly basis.  Therefore, we hold, affirming the trial court, that Kachigian was a month-to-month tenant and, as such, is liable for rent for the period he occupied the office suite.").)  What is more, Seeman does not argue – nor do the facts suggest – that either entity was undercapitalized at any relevant time.

Instead, Seeman's primary arguments for a unity of interest are, first, that Rendel's and PJMP are so intimately integrated that they must share a unity of interest and, second, that the manner in which the two entities allocate salaries and expenses between them amounts to improper commingling of funds.  The Court takes these in turn.

Seeman's first contention focuses on the extent of the entities' integration, but that doesn't advance the ball.  "The corporate veil is pierced, when it is pierced, not because the corporate group is integrated, but (in the most common case) because it has neglected forms intended to protect creditors from being confused about whom they can look to for payment of their claims."  *Papa,* 166 F.3d at 943 (citations and internal citation omitted).  The *Papa* court enumerated several ways in which corporations may integrate, while nevertheless preserving the ability of creditors to look to the proper entity for payment, and thus still fall within the small-employer

exemption: by sharing accounting and payroll, pooling of employee benefits, and common ownership. *See, id.* at 942.

Most of the facets of PJMP's integration with Rendel's – for example, shared telephone lines, letterhead, health insurance, employees such as Mazor and the Polcyns, ownership, a consumer-facing business name, and premises (although PJMP in fact had its own separate tow office and cashier) – are legally insufficient for a "unity of interest" finding under *Papa. See, e.g., Bridge,* 815 F.3d at 364-65 (finding no "misuse of corporate form" sufficient for veil-piercing where two corporations shared similar names, directors, employees' services, personnel manuals, health-insurance benefits, and a website); *Fusion Med. Spa,* 836 F.Supp.2d at 777 (finding no unity of interest where "Wise was president and part-owner of Fusion and president and sole owner of Synergy, plaintiff's health insurance was provided through a Synergy policy, part of plaintiff's job responsibilities included cross-selling Synergy services, and the two corporations shared physical space, telephone lines, letterhead, accountants and some employees"); *Macrito,* 2011 WL 5101712, at *4 (refusing to aggregate employees under *Papa* where two corporations shared president and payroll coordinator, operated and received phone calls out of same address, worked on same projects together, and held themselves

out as "sister" companies); *Walker v. Macra Const. Inc.,* No. 02 C 3285, 2003 WL 297529, at *4 (N.D. Ill. Feb. 11, 2003) (finding no Title VII aggregation where two companies operated out of same building, were owned by same family, shared business telephone number, and employed same person to answer calls and prepare payroll and quarterly reports); *Wilson v. Comtrust LLC,* 249 F.Supp.2d 993, 998 (N.D. Ill. 2003) (refusing to aggregate employees among three entities created by same person that shared letterhead, office building, employees, and accounting firm); *Atkins v. JAD Hosiery, Inc.,* No. 99 C 4055, 2000 WL 988534, at *3 (N.D. Ill. July 17, 2000) (finding aggregation under Title VII inappropriate where entities "were interrelated in that they all sold and marketed same product, shared a corporate logo, shared directors and offices, and conducted some inter-office business").

Seeman points the finger at additional facets of Defendants' integrated business, but they only serve as microcosms of his failure to grasp the point. For example, that the collective bargaining agreement between Rendel's and Local 179 includes classifications for tow truck drivers is immaterial to the veil-piercing inquiry. As the court in *Papa* noted, "a focus on integration makes sense" when the National Labor Relations Board seeks to determine "what the appropriate

bargaining unit is." 166 F.3d at 942. "If the work forces of two affiliated corporations are integrated, there is an argument for a single bargaining unit covering both of them, and also an argument that they should be combined for purposes of determining whether the effect on commerce is substantial enough to justify the Board in asserting jurisdiction. But there is no argument for making on affiliate liable for the other's independent decision to discriminate." *Id.* at 943.

As such, PJMP has not forfeited its right to be treated as a separate entity merely by integrating with Rendel's to enjoy economies of scale or assuming its name to preserve whatever goodwill in the towing industry had inured to Rendel's by virtue of its decades of prior experience.

Seeman's final argument for aggregating employees relies on what he characterizes as commingling of funds: the allocation of salaries and other expenses from Rendel's to PJMP for accounting purposes. Seeman claims there is a material dispute as to whether physical funds transfers consistently occurred and cries foul at the failure of Mazor's and the Polcyns' W-2s to reflect their allocated salaries. (Note that all of Seeman's compensation – other than the disputed issue of out-of-pocket reimbursements for fuel costs and the like – was paid by PJMP directly, and Rendel's allocated such out-of-pocket

reimbursements to PJMP.  (Defs.' Resp. at Ex. 3 ("Mazor Aff.")
¶ 3.))  Neither party has furnished authority relevant to the
sort of salary and overhead allocations Defendants engaged in,
but the Court views their arrangement as merely one in which
"accounting records always reflect the indebtedness of one
entity to another," which "is not the equivalent of
intermingling funds." *In re Acushnet River & New Bedford Harbor
Proceedings,* 675 F.Supp. 22, 34 (D. Mass. 1987), *cited with
approval, Judson Atkinson Candies, Inc. v. Latini-Hohberger
Dhimantec,* 529 F.3d 371, 380 (7th Cir. 2008) ("[Plaintiff] has
not cited any evidence to counter CIC's assertions that it
maintained a strict accounting of each subsidiary's balance.").
Seeman neither alleges nor adduces evidence that Defendants'
accounting records were inaccurate, and so it seems immaterial
whether funds corresponding to the allocations were transferred
between the two accounts on some routinized basis or, as in
*Acushnet,* the sister companies made periodic deposits into
consolidated accounts.  *See,* 675 F.Supp. at 34.  Sporadic or
irregular funds transfers between affiliates may be problematic
from a commingling standpoint if evidence suggests that they
were necessary to meet the recipient's current obligations.
*See, Van Dorn,* 753 F.2d at 571-72.  However, such is not the
case here.  As there is no indication "that funds collected by

one entity were . . . deposited into the other's (separate) bank account" without a documented corresponding offset to that entity's liabilities, *Bridge,* 815 F.3d at 365 n.4, there is no triable question whether Rendel's and PJMP commingled funds.

The Court finds instructive *Jackowski v. Seoco, Inc. Northern,* No. 98 C 50337, 2001 WL 709485 (N.D. Ill. June 22, 2001). There, substantial questions of fact precluded summary judgment on the issue of whether two corporate entities, Seoco and Seoco Northern, maintained separate existences. With respect to commingling of funds, the court first noted that "a centralized cash management system where accounting records track the indebtedness of each entity is not the equivalent of intermingling funds." *Id.* at *2. It further recounted how "the Secretary/Treasurer of both companies, states that *expenses* are allocated to each company, as are *deposits* and *assets.*" *Ibid.* (emphases added). However, what prevented summary judgment on the commingling issue was how payroll expenses went unallocated:

> It is not clear whether these [allocated] expenses
> include *payroll expenses*. For example, Ed Schmidt
> states that he has not received a salary from Seoco
> Northern. He also states that, to the extent he has
> dealt with Seoco Northern employees, he has done so in
> his capacity as President of Seoco Northern. The
> record does not show whether, when acting in his role
> as Seoco Northern President, Ed Schmidt was working
> for free, or whether Seoco was footing the bill. The
> latter scenario indicates funds were commingled and

lends support to the conclusion that each corporation has failed to maintain a separate existence.

*Ibid.* (emphasis added). In this case, however, it is undisputed that the allocations *did* include payroll expenses. Rendel's paid the Polcyns and Mazor their salaries subject to allocations to PJMP corresponding to the time they spent performing work for PJMP or supervising its employees. PJ and Michael even received hourly compensation directly from PJMP to the extent they had to perform after-hours towing and recovery-related duties – that is, duties that it would be reasonable to think were not subsumed within the portion of their normal salary allocated to PJMP. Without adducing evidence impugning the integrity of Defendants' or Mazor's administration of this allocation system, Seeman establishes only that Rendel's and PJMP are sister companies sharing expenses and internally accounting for each entity's respective assets and liabilities.

Again failing to furnish the Court with relevant authority, Seeman protests that end-of-year salary allocations should be reflected on the Polcyns' or Mazor's W-2s. Yet how Rendel's and PJMP conduct their internal accounting does not change the amount of taxable income that Rendel's pays the Polcyns and Mazor. The Court genuflects to the wisdom of the Internal Revenue Service as to the propriety of Defendants' method of tax

reporting.   It suffices to note the absence of authority treating the manner in which a party reports payroll tax liabilities as an act of commingling funds.

In the same vein, that customers who obtain both towing services from PJMP and repair services from Rendel's may at times receive just one invoice from Rendel's is irrelevant to the veil-piercing inquiry here.   After performing services, Defendants are creditors of such customers, and so this invoicing practice does not bear on the crucial veil-piercing inquiry concerning whether creditors would be misled as to which Defendant they could pursue for payment.   *See, Macrito,* 2011 WL 5101712, at *5 ("While Macrito states that Events would bill clients for work performed by Events Electrical and that Events' clients had no knowledge as to whether Events or Events Electrical employees were performing various tasks, such client-based assertions are not relevant to the issue of creditor confusion or fraud."); *Atkins,* 2000 WL 988534, at *3 ("The doctrine of veil piercing is intended to protect creditors, not customer-debtors, from being confused about which entity the creditor may pursue for outstanding claims.") (citing *Papa,* 166 F.3d at 943); *see also, Fusion Med. Spa,* 836 F.Supp.2d at 777 ("[Plaintiff's] affidavit only establishes that Synergy and Fusion shared a machine used in treating patients, and that when

the machine was used for weight loss treatments patients were billed for a Fusion medical spa procedure even though they were physically treated in the Synergy space."). In fact, Defendants submitted dozens of pages of evidence showing the opposite with respect to its usual creditors – namely, that parts suppliers billed PJMP specifically and were paid with funds from PJMP's First Midwest Bank account. (*See,* ECF No. 77 at Ex. 3 & 3-B.) To the extent Seeman's sworn statement – contrary to Mazor's and untethered to comparable documentation – that some of these purchases were for parts to be used at Rendel's implicates a dispute of fact, it represents at best a mere scintilla of evidence in favor of commingling, and is thus insufficient to defeat summary judgment.

### 2. *Sanction a Fraud or Promote Injustice*

Even if there were a sufficient unity of interest, the fact remains that refusing to aggregate Defendants' employees would not condone a fraud or work an injustice – the required second element of a successful veil-piercing claim under Illinois law. *See, e.g., Sea-Land Servs., Inc. v. Pepper Source,* 941 F.2d 519, 520 (7th Cir. 1991) (quoting *Van Dorn,* 753 F.2d at 569-70). The injustice must be more than, for example, an unsatisfied judgment. *Id.* at 522. Instead, the plaintiff must show that a party would be unjustly enriched; a corporation that caused a

subsidiary's or affiliate's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would succeed. *Id.* at 524.

Plainly, none of these circumstances obtain here. In fact, the only evidence in the record concerning a global "injustice" cuts against piercing the veil. It is undisputed that PJMP's *raison d'être* was to enable provision of workers' compensation insurance, something Rendel's apparently could not do if it continued offering towing and recovery services.

*   *   *

Because Rendel's and PJMP do not enjoy a unity of interest sufficient to justify aggregating their employees, summary judgment is granted to PJMP on the grounds that it lacked sufficient employees to constitute an "employer" under the ADA. In the alternative, the Court grants summary judgment to PJMP on the basis that failing to pierce the veil under these circumstances would not sanction a fraud or promote injustice.

**B. Did Rendel's Have an Employment Relationship with Seeman?**

Unlike PJMP, Rendel's employed enough individuals to constitute a Title VII "employer." However, Rendel's argues that it had no employment relationship with Seeman and so is an

- 21 -

improper defendant in his lawsuit. Thus, the central issue remaining in the case is whether Rendel's, taking the undisputed facts in the light most favorable to Seeman, qualified as his "employer." Although Seeman at times characterizes his argument for Rendel's liability as a "joint employer" theory, his brief focuses on arguing that Rendel's had an employment relationship with him under traditional principles of agency law. (*See,* ECF No. 55 ("Pl.'s Br.") at 9–11.)

A few preliminaries are in order. Strictly speaking, the joint employer theory of liability "arises out of the temporary employment context, where an employment agency or staffing firm places an individual worker at a separate and unrelated job site." *Fusion Med. Spa,* 836 F.Supp.2d at 778 (refusing to apply "the joint employer theory, or 'economic realities test,' to the question of the small-employer exemption, particularly in the absence of a temporary employment relationship"); *see also, Whitaker,* 772 F.3d at 811–12 (noting that EEOC guidance "addressing joint employment relationships" was "[w]ritten for the specific context of temporary employment agencies sending employees to clients"). As such, "joint employer" liability in its pure sense is a poor fit for the employment context at issue here. However, it is well-established that a plaintiff may have multiple employers for purposes of Title VII liability. *See,*

*e.g., Tamayo v. Blagojevich,* 526 F.3d 1074, 1088 (7th Cir. 2008). Similarly, a plaintiff may bring a claim against a defendant who is a "de facto or indirect employer" insofar as it "controlled the plaintiff's employment relationship." *EEOC v. Illinois,* 69 F.3d 167, 169 (7th Cir. 1995). The issue of Rendel's propriety as a defendant in this case is thus best understood not through the technical "joint employer" lens but instead purely on the basis of whether Rendel's exercised sufficient control over Seeman's employment to constitute (at least) an indirect employer. If there is a genuine dispute of material fact as to whether it did, then summary judgment to Rendel's is improper.

The controlling test for determining whether a defendant can be deemed an indirect employer is the "economic realities" test, and *Knight v. United Farm Bureau Mut. Ins. Co.,* 950 F.2d 377 (7th Cir. 1991), articulates a detailed iteration of this test. *See, e.g., Love v. JP Cullen & Sons, Inc.,* 779 F.3d 697, 702 (7th Cir. 2015) ("[T]he five *Knight* factors are simply a more detailed application of the economic and control considerations present in the 'economic realities' test."). The *Knight* factors are: (1) the extent of the putative employer's control and supervision over the putative employee; (2) the kind of occupation and nature of skill required; (3) the putative

employer's responsibility for operating costs; (4) the method and form of payment and benefits; and (5) the length of the job commitment. *Knight,* 950 F.2d at 378-79. The first factor – the extent to which the putative employer controlled the alleged employee – is the most important. *See, Love,* 779 F.3d at 702-03. (Both parties agree that the fifth factor – length of the job commitment – bears little relevance here and "is more applicable in the context of a case where the court is asked to decide whether an individual is an employee or an independent contractor of a company." (Pl.'s Br. at 11.))

Here, several undisputed facts are germane to Rendel's control and supervision of Seeman. For example, approximately once every other week, Seeman picked up auto parts from various stores for Rendel's repair services and parts department. Because Rendel's maintains that it operates as a dealership and repair shop only – in contrast to PJMP, which handles only towing and recovery operations – Seeman appears to have been receiving at least some semi-regular work assignments from the Polcyns or Mazor in their capacity as Rendel's personnel. In addition, both parties agree that Seeman took direction from PR, Rendel's body shop manager in 2015 and 2016 (although he was transitioning to a PJMP role). While the record is in equipoise as to whether PJ's, Michael's, and Mazor's supervision of Seeman

was incident to their Rendel's or PJMP capacities, the Court finds it reasonable to infer that PR in his Rendel's capacity supervised or controlled at least some of Seeman's day-to-day activities – particularly those earlier on in his tenure, which began in January 2014 (well before PR is alleged to have begun transitioning to a PJMP role). Third, the letter to Seeman providing instructions and listing permitted actions following his putative resignation – the letter that Seeman claims consummated his termination - was signed by "Rendel's management." Whereas the Court does not find it significant that this letter was written on Rendel's letterhead, that it was signed by Rendel's management and not PJMP's management bespeaks the former's authority to hire or fire Seeman (and potentially to promulgate work rules, given the letter's contents). After all, "[c]ontrol depends, to a significant degree, on the ability to hire and fire." *Bridge,* 815 F.3d at 361 (citing *Love*, 779 F.3d at 703). Viewed in the light most favorable to Seeman, these undisputed facts show some degree of supervision and control over his employment, and thus support characterizing Rendel's as at least Seeman's indirect employer.

In addition, the parties disagree on nearly every fact issue pertaining to whether the Polcyns and Mazor were acting on behalf of Rendel's or PJMP when they hired, instructed,

supervised, dispatched, and disciplined Seeman throughout his employment, as well as when they allegedly terminated him. The record is devoid of evidence that would permit a determination of what individual was acting on which company's authority and when. As such, at the very least there remain genuine disputes of material fact as to whether Rendel's exercised sufficient control over the terms and conditions of Seeman's employment to constitute his Title VII "employer."

The second *Knight* factor concerns the type of occupation and nature of skills required for the job. For example, if important job skills were obtained in the putative employer's workplace, this suggests an employment relationship. *See, Love,* 779 F.3d at 704 (citing *Knight,* 950 F.2d at 378). Perhaps predictably, whereas Seeman claims that the Polcyns trained him in their Rendel's capacity, Rendel's asserts that any training came from the Polcyns in their capacity as PJMP employees (and in PJ's case, as the owner of PJMP). This is a quintessential factual dispute. However, viewed objectively, the type of occupation and nature of the job – driving a tow truck, towing cars, assisting with automobile recovery, and acquiring auto parts from suppliers – do not suggest that Seeman obtained important job skills with Rendel's imprimatur. As such, to the

extent it is ascertainable at this stage, this *Knight* factor seems to weigh neutrally.

The third factor concerning operating costs favors a finding of employer status. Although PJMP bore some of the larger costs of its operation by leasing its trucks from Rendel's, paying the salaries of tow truck drivers such as Seeman, and remitting $5,000 in monthly rent to Rendel's, it did not pay the salaries of its upper-level employees and took advantage of all the efficiency gains, cost synergies, economies of scale, and overhead savings explored earlier in this Opinion afforded by integration with Rendel's. Thus, Rendel's shouldered significant operating costs with respect to Seeman's employment.

The fourth factor - whether the putative employer was responsible for providing payment or benefits to the putative employee – disfavors a finding of employer status because, with the disputed exception of some out-of-pocket reimbursements, Rendel's paid Seeman no compensation. And while employees from both Rendel's and PJMP "participated in the same group health-insurance plan, there is no indication that [Rendel's] provided any direct benefits to" Seeman. *Bridge,* 815 F.3d at 362.

In the final analysis, then, the most important *Knight* factor favors a finding of employer status, the second factor is

neutral or otherwise indeterminate on the current record, the third factor weighs in favor of a finding of employer status, and the fourth factor disfavors such a finding. As a result, Rendel's lacks entitlement to judgment as a matter of law that it was not at least Seeman's indirect employer under Title VII. Summary judgment is accordingly denied to Rendel's.

### III. <u>CONCLUSION</u>

For the reasons stated herein, Defendant PJMP's Motion for Summary Judgment [ECF No. 46] is granted. Defendant Rendel's Motion for Summary Judgment [ECF No. 42] is denied.


**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: August 3, 2017